FILED
2020 Mar-02  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RODNEY ERRTHUM,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **CASE NO.**_____ |
| | ) | |
| **METROPOLITAN LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Rodney Errthum, and hereby files his Complaint against MetLife.

## PARTIES

1.      The Plaintiff, Rodney Errthum ("Mr. Errthum"), is an insured under Group Long Term Disability Plan for employees of Pattison Sand Company, LLC, identified as Group Insurance Policy KM 05738034 ("the Plan"), who has been improperly denied disability benefits under the Plan.

2.      Defendant, Metropolitan Life Insurance Company ("MetLife"), is the Administrator of the Plan. Upon information and belief, MetLife is a foreign corporation which conducts business generally in the state of Alabama and specifically within this District.

1

## JURISDICTION AND VENUE

3.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  Plaintiff asserts claims for long term disability ("LTD") benefits, enforcement of ERISA rights and statutory violations of ERISA under 29 U.S.C. § 1132, specifically, Mr. Errthum brings this action to recover benefits due to him pursuant to 29 U.S.C. §1132(a)(1)(B) and to enforce his rights under the Plan pursuant to 29 U.S.C. §1132(a)(3).   This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §§ 1132(a), (e)(1) and (f) and 28 U.S.C. § 1131. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## INTRODUCTION

4.      The Plaintiff in this case was subjected to improper claim handling procedures by MetLife as it exploited the shortcomings of ERISA as it relates to claims for "welfare" benefits to avoid paying Mr. Errthum's valid claim for disability benefits. The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). Mr. Errthum, as an employee insured for disability, was supposed to be treated as a beneficiary by MetLife as a statutory fiduciary. Instead, MetLife has breached those duties and victimized Mr.

Errthum by engaging in improper claim handling procedures. As described in more detail below, MetLife has clearly engaged in bad faith claim handling and Mr. Errthum, at minimum, is entitled to *de novo* review and all relief that ERISA provides.

## STATEMENT OF FACTS

5.      Mr. Errthum is an insured for benefits under the Plan. MetLife is the administrator of the Plan. The Plan provides insureds, like Mr. Errthum, LTD benefits and was in full force and effect at all times relevant to this Complaint.

6.      At all relevant times, Mr. Errthum was employed by Pattison Sand Company, LLC and was a covered participant in the Plan, as defined in 29 U.S.C. § 1002(7) and under the terms and conditions of the Plan.

7.      Mr. Errthum, a man of fifty-one years of age, worked at Pattison Sand Company, LLC for several years, working his way up through the company, until his disabilities forced him to stop working on or about December 2, 2016.

8.      Mr. Errthum was employed by Pattison Sand Company, LLC as a Plant Manager, whose job duties required managing daily operations in the plant facility; ensuring safety and efficiency; testing and monitoring plant processes; remaining in compliance with company operating procedures, policies, and HSE guidelines, ensuring all are in compliance with MSHA and OSHA compliance; preparing, analyzing, and issuing production and performance reports; maintaining all

administrative records; controlling costs to achieve company budget goals; working directly with supervisors to ensure they attain their goals; coaching and developing supervisors and operators; monitoring samples and date to prevent problems and make necessary changes or corrections in a timely manner; and performing frequent audits on safety, SOP's, trainings, production and quality. Plant Managers were required to be flexible and willing to work in extreme conditions. Mr. Errthum's position as a Plant Manager is classified as Heavy work.

9.    Mr. Errthum's medical disabilities include Lyme disease, chronic fatigue, mycotoxin-induced illness, common variant immune deficiency, fibromyalgia, headache, myalgia, dizziness with poor balance, generalized anxiety disorder, and depressive disorder not otherwise specified with chronic pain features. The symptoms of his impairments and the side effects of the medications and treatment prescribed render Mr. Errthum unable to perform any job.

10.    By letter dated March 22, 2017, MetLife wrongfully denied Mr. Errthum's LTD benefits.

11.    The Plan at issue, as governed by ERISA and relied upon to deny Mr. Errthum's LTD benefits states, in part:

Disabled or Disability means that, due to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

  - during the Elimination Period and the next 36 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation in Your Local Economy; and

  - after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education, and experience.

12.     The Plan at issue, as governed by ERISA and relied upon to deny Mr. Errthum's LTD benefits, further provides for a work incentive, stating:

While You are Disabled, We encourage You to work. If You work while You are Disabled and receiving Monthly Benefits, Your Monthly Benefits will be adjusted as follows:

- Your Monthly Benefit will be increased by Your Rehabilitation Program, if any; and

- reduced by Other Income as defined in the DISABILITY INCOME INSURANCE: INCOME WHICH WILL REDUCE YOUR DISABILITY BENEFIT section.

13.    MetLife's denial of LTD benefits issued on March 22, 2017 was based at least in part upon the review of MetLife's own Medical Director, Dr. Puja Korabathina ("Dr. Korabathina").

14.    Prior to the denial of Mr. Errthum's benefits, Mr. Errthum was under the consistent care of his integrative medicine specialist, Dr. Karen Vrchota ("Dr. Vrchota") and his allergy-immunology specialist, Dr. John C. Moore ("Dr. Moore"), and during the relevant period he also regularly treated with his chiropractor, Dr. Shannon White ("Dr. White"); his psychologist, Dr. Thomas Ottavi ("Dr. Ottavi"); his psychiatrist, Susan Amundsen, PA-C ("Ms. Amundsen"); his neurologist, Dr. Preeti Joseph ("Dr. Joseph"); and his current primary care physician, Dr. Robert S. Waters ("Dr. Waters").

15.    On December 8, 2016, Dr. Vrchota wrote that Mr. Errthum's frequent pain and fatigue would require him to leave work on short notice that he would be unable to attend work for several days if his symptoms increased in severity and duration, and that these restrictions were expected to be in effect between November 9, 2016 and April 9, 2017.

16.    On January 5, 2017, Dr. Vrchota completed an Attending Physician Statement wherein she noted diagnoses of common variable immunoglobulin deficiency, mononeuritis multiplex, and possible Lyme disease and mycotoxin-induced illness causing symptoms of fatigue, dizziness, weakness, joint pain, knee

swelling, decreased range of motion, and lymphadenopathy. Dr. Vrchota further asserted that Mr. Errthum was capable only of intermittent sitting throughout an eight-hour workday, standing and walking one hour or less throughout an entire day, and never climbing, balancing, bending, twisting, stooping, or driving, restrictions incompatible with the Heavy physical exertional requirements of Mr. Errthum's own occupation..

17.     Dr. Vrchota filled out a questionnaire regarding Mr. Errthum's medical condition on January 5, 2017, noting a marked increase in dizziness, poor balance, inability to track information, and poor ability to hear, remember, or follow through on actions limiting his ability to walk, hear, listen, speak, communicate, or drive. Accordingly, Dr. Vrchota opined that Mr. Errthum was completely unable to work and would remain unable to work into the foreseeable future.

18.     Dr. Korabathina evaluated Mr. Errthum's medical file on March 9, 2017 and determined that restrictions and limitations due to chronic fatigue syndrome and chronic pain were reasonable only between December 2, 2016 and March 3, 2017 but that ongoing restrictions and limitations were not supported by medical documentation past March 3, 2017.

19.     MetLife failed to consider the opinions of Mr. Errthum's treating physicians in its decision to deny benefits; on March 10, 2017, MetLife requested an updated opinion from Dr. Vrchota in response to Dr. Korabathina's review, and

on March 14, 2017 Dr. Vrchota responded that Mr. Errthum would need to be seen in-office in order to provide such an update.

20.    Instead of waiting until after Mr. Errthum's next scheduled appointment with Dr. Vrchota on March 27, 2017, MetLife instead issued its denial of LTD benefits on March 22, 2017.

21.    MetLife relied on the opinion of its own Medical Director over the opinion of Mr. Errthum's treating providers in coming to its decision to deny LTD benefits.

22.    At all relevant times of MetLife's review of Mr. Errthum's claim, MetLife had the contractual right to obtain better evidence of Mr. Errthum's disability by ordering an independent medical examination.

23.    Rather than ordering Mr. Errthum to sit for an independent medical examination, MetLife relied on a record review from a partisan source to support its denial of LTD benefits.

24.    On March 27, 2017, Dr. Vrchota provided a statement noting that "from the time period of 12/03/2016 through 03/27/2017, Rodney Errthum has been unable to work due to fatigue, muscle weakness, joint pain and dizziness. These symptoms have greatly impaired his ability to walk, climb, lift, drive, listen, speak and understand."

25.     Dr. Vrchota suggested a gradual attempt to return to work, initially only twelve hours per week.

26.     The Director of Human Resources for Pattison Sand Company, Courtney Severson, recounted Mr. Errthum's unsuccessful work attempt in a statement dated August 17, 2017, wherein she noted that since Mr. Errthum's return to work in April 2017 "his ability to work has not been consistent" and that "his poor health condition just does not allow for [work] most days." Included in this statement was a list of the weekly hours worked by Mr. Errthum between April 10, 2017 and August 13, 2017 which showed marked inconsistency and an overall reduction in hours worked.

27.     Although Mr. Errthum attempted to comply with Dr. Vrchota's plan to resume work, the documented work hours provided from his employer shows a clear inability to meet this goal to return to full duty work.

28.     By and through counsel in a letter dated September 15, 2017, Mr. Errthum appealed the denial of his LTD benefits. Mr. Errthum included with his appeal letter additional medical records outlining the decline of his condition, as well as several declarations from family, friends, and coworkers.

29.     Office notes from Dr. Vrchota spanning March 27, 2017 to June 7, 2017 were provided to MetLife and demonstrated a regular pattern of increased activity during attempts to work immediately followed by a corresponding increase in

symptoms and decrease in function in the subsequent days due to Mr. Errthum's diffuse chronic pain, chronic fatigue, dizziness, and headaches secondary to mycotoxin-induced illness and most likely Lyme disease.

30.   Josh Corlett, Mr. Errthum's coworker for nine years, provided a statement as part of Mr. Errthum's appeal and reported that the claimant's medical condition "has gotten to a point that since October of last year I have worked with him maybe 14 days and when I say days I should really say hours as he is only able to handle about 6 hours and is so run down that he needs to go home."

31.   Mr. Errthum's wife, Karen Errthum, likewise provided a statement in support of her husband's appeal and noted regular symptoms of headaches, vertigo, fatigue, and severe joint pain resulting in "weeks when he is unable to work much less leave the house."

32.   In a letter dated September 5, 2017, Kyle Pattison, owner and manager of Pattison Sand Company, LLC, opined that throughout Mr. Errthum's employment beginning in August 2008 he had been "top performing and one of my go to people at the River Plant." Mr. Pattison recounted that Mr. Errthum's health "has deteriorated quite rapidly" over the prior year, preventing him from working on a consistent basis.

33.   Dr. Korabathina reevaluated Mr. Errthum's claim and in an Addendum to Claim dated September 20, 2017 noted a documented attempt to return to work

10

over the prior several months with only two weeks of full duty work achieved. In spite of the demonstrably unsuccessful nature of Mr. Errthum's work attempt, Dr. Korabathina determined following a review of the updated file that Mr. Errthum was capable of a graduated return to work from March 27, 2017 to July 10, 2017, after which unimpeded ability for full duty work was projected.

34.     In a letter dated October 31, 2017, MetLife informed Mr. Errthum of an approval of LTD benefits spanning only between December 3, 2016 and July 10, 2017, noting that the medical records did not support a severity of symptoms which would preclude Mr. Errthum from performing the duties of his own occupation on a full-time basis.

35.     In coming to this decision, MetLife again relied upon the opinion of its own Medical Director and disregarded the fact, well-documented within the provided records, that Mr. Errthum's attempts to work were sporadic, his absences were frequent, and he had not regained the ability to perform the full duties of his previous occupation as a Plant Manager.

36.     By and through counsel in a letter dated June 6, 2018, Mr. Errthum appealed the termination of his LTD benefits. Included in this appeal were records from Dr. White and from Medical Associates Clinic documenting Mr. Errthum's persistent symptoms and impairments.

37.     Records from Medical Associates Clinic included neurology notes between November 2017 and February 2018 for dizziness, fatigue, brain fog, dizziness, off-balance, cognitive dysfunction, sleep issues, and shaking of the right upper extremity, during which he was found to have active diagnoses of arthralgia, fatigue, fibromyalgia, generalized anxiety disorder, headache, insomnia, and long-term use of high-risk medication.

38.     Included in these records from Medical Associates Clinic was neurocognitive testing, prompted by Mr. Errthum's history of Lyme disease with cognitive effects unresponsive to treatment, performed on December 8, 2017 and demonstrating deficit scores in areas of semantic fluency, working memory, attention, and immediate and delayed memory as compared to his premorbid functioning. Follow up neurocognitive testing on January 12, 2018 subsequently showed Mr. Errthum to struggle with performance in memory and to have relative slowing of processing for information.

39.     In comparing Mr. Errthum's two neurocognitive testing results, Dr. Ottavi noted the likelihood of frequent daily effects from physical fatigue resulting in mental focus and effort interference, and Dr. Ottavi further noted on January 29, 2018 that "if there is not a return of the mental sharpness on its own or in combination with sufficient mental endurance (and physical/energy to back it up)

then it is not a match to go back to what was a fairly demanding job description when at full functioning."

40.     In a statement dated May 29, 2018, Dr. White noted observations of severe fatigue, joint pain, anxiety, and sleep deprivation making it difficult to function and impossible to work, spanning back to the first appointment with Mr. Errthum the previous August. Dr. White clarified that "Rod's symptoms have made it difficult for him to work because of the inability to concentrate due to fatigue, brain fog, and anxiety. His joint pains have also limited his ability to work. Based upon my personal evaluations and experience with Rod, he would not be capable of engaging in full time employment of any sort."

41.     Dr. White also reviewed Dr. Korabathina's March 9, 2017 medical review and asserted in her May 29, 2018 statement that the minor limitations assigned by Dr. Korabathina were accurate only during those brief times when Mr. Errthum was able to function and that ongoing restrictions and limitations were warranted as "Rod remains just as limited at present."

42.     Despite providing proof of his disability both before the termination of benefits and throughout the appeals process, MetLife refused to award Mr. Errthum's LTD benefits and issued its final denial by letter dated August 28, 2018.

43.     In its final termination letter dated August 28, 2018, MetLife relied upon the opinions of paid medical reviewers Dr. Jeremy Hertza ("Dr. Hertza") and

Dr. Marvin Pietruszka ("Dr. Pietruszka").

44.     Dr. Hertza, who has never seen nor treated Mr. Errthum, acknowledged in his June 26, 2018 report the claimant's extensive treatment with his psychiatrist, psychologist, and neurologist, noted diagnoses of generalized anxiety disorder and unspecified depression, and referenced his neurocognitive tests, yet nevertheless determined that neither cognitive limitations nor psychiatric impairment were supported.

45.     Dr. Hertza did not attempt to contact Mr. Errthum's current treating physicians, instead attempting to call his allergy and immunology specialist, Dr. Moore, who last treated the claimant in February 2017; his integrative health specialist, Dr. Vrchota, who last saw Mr. Errthum in June 2017; and his rheumatologist, Dr. Mark W. Niemer ("Dr. Niemer"), who saw Mr. Errthum only once in October 2017. Even these attempts were cursory, as Dr. Hertza called the offices of Dr. Moore and Dr. Vrchota only once and, when instructed on a specific time and date to best reach Dr. Niemer, disregarded this information and placed his second call to this office a full business day before the advised timeframe.

46.     Although Dr. Hertza professed to review Mr. Errthum's recent neurocognitive testing and Dr. Ottavi's corresponding statements, he nevertheless declared that Mr. Errthum's medical file "contained no evidence of global and continuous cognitive or psychiatric impairment."

47.     By asserting that Mr. Errthum had no "global and continuous" cognitive and psychiatric impairments, Dr. Hertza applied an improper test of disability unreflective of the Policy. Per the Policy, Mr. Errthum was required to be unable to earn, due to sickness or accidental illness, more than 80% of his Predisability Earnings at his Own Occupation, and thus Dr. Hertza's assertion of a "global" ability for general occupational functioning disregarded, specifically, the heavy nature, necessary cognitive skills, and the need for flexibility and exposure to extreme conditions inherent in Mr. Errthum's position as Plant Manager.

48.     Despite commenting on Mr. Errthum's capacity for work from a neuropsychological perspective, Dr. Hertza did not even attempt to contact the claimant's psychologist, Dr. Ottavi, or psychologist, Ms. Amundsen.

49.     Dr. Hertza noted diagnoses of generalized anxiety disorder and unspecified depression, but neither noted nor considered Mr. Errthum's diagnosis of Lyme disease and the effect this condition had on his cognitive capacity.

50.     Dr. Pietruszka, who has never seen nor treated Mr. Errthum, rendered an opinion that Mr. Errthum was not functionally limited or restricted as of July 11, 2017 onward, despite referencing records from Dr. White noting low back pain, decreased spinal range of motion, severe spasms of the cervical and lumbar spine, joint pain, and fatigue, as well as Dr. White's letter asserting ongoing limitations and an inability to return to work.

51.     Dr. Pietruszka cited a lack of medical documentation to justify his assertion that Mr. Errthum experienced no functional deficits, blatantly overlooking treatment from Dr. White demonstrating decreased spinal range of motion and noting fatigue and joint pain and from Dr. Vrchota showing unbalanced gait with positive Romberg testing.

52.     Dr. Pietruszka, too, failed to contact Mr. Errthum's treating physicians for their medical opinion, attempting phone calls with Dr. Vrchota and Dr. Moore, who had last treated the claimant more than a year prior, and leaving only two messages for Dr. White.

53.     Although he had only seen Mr. Errthum for a single appointment in October of 2017, Dr. Niemer was asked his opinion of the reviews carried out by Dr. Hertza and Dr. Pietruszka, and on July 6, 2018 Dr. Niemer responded with no comment upon the reports save an agreement.

54.     In an addendum to his report dated August 2, 2018, Dr. Pietruszka noted both Dr. Niemer's agreement and treatment records from Mr. Errthum's current treating physician, Dr. Waters demonstrating lumbar trigger points detected during an initial evaluation. Despite access to more up-to-date information, Dr. Pietruszka seemed to give more weight to Dr. Niemer's stance and asserted that his medical opinion remained unchanged.

55.     Dr. Pietruszka also opined that "the claimant's statement that he is

unable to do any work is inconsistent with the fact that he is working at least part time," overlooking the fact that not only did the Plan provide for a work incentive, encouraging its insureds to work while disabled, but that Mr. Errthum's work attempts were largely unsuccessful, consisting of significantly decreased hours and limited work tasks incompatible with the full duties and normal performance of his own occupation.

56.     MetLife's paid reviewers appeared to conduct their reviews with an underlying bias, as both Dr. Hertza and Dr. Pietruszka utilized language not present in the Policy as standards for denial; Dr. Hertza advanced a standard of global symptoms and generalized occupational functioning incompatible with the Policy's Own Occupation requirements, while Dr. Pietruszka overlooked the Work Incentive clause of the Policy to deem Mr. Errthum's limited and intermittent attempts to work "inconsistent" with his claim of an inability to perform the duties of his own occupation.

57.     In an Attending Physician Statement dated January 10, 2019, Dr. White noted that Mr. Errthum suffered from Lyme disease and chronic fatigue and was subsequently unable to stand, walk, or sit for more than one hour intermittently or, due to heightened anxiety during periods of illness, to engage in stress situations or interpersonal relations. Dr. White noted that he had not advised Mr. Errthum to return to work.

58.     The contention advanced by MetLife and its paid medical reviewers that Mr. Errthum was not disabled directly contradicts the opinion of his treating physician, Dr. White.

59.     As of this date, Mr. Errthum has been denied benefits rightfully owed to him under the Plan.

60.     Mr. Errthum has met and continues to meet the Plan's definition of disabled.

61.     Mr. Errthum has exhausted any applicable administrative review procedures and his claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

62.     MetLife's refusal to pay benefits has caused tremendous financial hardship on Mr. Errthum.

## STANDARD OF REVIEW

63.     A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan.

64.     When discretionary authority is clearly granted and the insurer of an ERISA plan also acts as a claims administrator, there is a structural or inherent conflict of interest that mandates a heightened arbitrary and capricious standard of review.

65.     Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to MetLife or to any other entity who may have adjudicated Mr. Errthum's claim. Therefore, the Court should review Mr. Errthum's claim for benefits under a *de novo* standard.

66.     Upon information and belief, MetLife evaluated and paid all claims under the LTD Plan at issue, creating an inherent conflict of interest.

67.     MetLife has failed to comply with the letter of the claims procedures outlined in ERISA and therefore Mr. Errthum's claim for benefits should be reviewed by this Court under a *de novo* standard.

68.     In the alternative, if the Court finds that MetLife is entitled to the heightened arbitrary and capricious standard of review, the termination of Plaintiff's benefits constitutes a clear abuse of discretion as MetLife's decision to deny Mr. Errthum's LTD benefits was arbitrary and capricious.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

69.     MetLife has wrongfully denied LTD benefits to Mr. Errthum, in violation of the policy provisions and ERISA, for the following reasons:

> (a) Mr. Errthum is totally disabled, in that he is unable to perform the duties of his Own Occupation due to sickness and is receiving appropriate care and treatment and complying with the requirements of such treatment;

(b) Mr. Errthum is entitled to disability benefits under the terms of the Plan, as he meets the Plan's definition of disability and he has otherwise met the conditions precedent of the Plan for coverage and entitlement to benefits;

(c) MetLife failed to accord proper weight to the evidence in the administrative record showing that Mr. Errthum is totally disabled;

(d) MetLife's interpretation of the definition of disability contained in the Plan is contrary to plain language of the Plan, unreasonable, arbitrary, capricious, and otherwise violated the standards required by ERISA;

(e) MetLife failed to acknowledge or abide by the Plan's Work Incentive, instead penalizing Mr. Errthum's unsuccessful work attempts and portraying limited and intermittent work as unimpeded functional capacity;

(f) MetLife failed to obtain and consider relevant information pertaining to Mr. Errthum's disability before it made a determination on his claim for LTD benefits;

(g) MetLife wrongfully denied Mr. Errthum a full, fair, and impartial review of his benefits claim pursuant to 29 C.F.R § 2560.503-1(h)(1), by ignoring the overwhelming weight and credibility of

evidence submitted and instead behaved as an adversary, looking instead for less credible evidence of marginal significance to support its goal of denying his benefits claim;

(h) MetLife failed to give proper weight to Mr. Errthum's own accounts regarding the debilitating effects of his pain;

(i) MetLife ignored the records and opinions of Mr. Errthum's treating physicians which show that Mr. Errthum is totally disabled, and instead based its decision to deny benefits on its internal review by MetLife staff members and its paid reviewers, who had never seen or treated Mr. Errthum, some of which never spoke with his treating physicians about the nature of his disability, and who were not as qualified as Mr. Errthum's treating physicians to formulate opinions regarding the nature and extent of his disability;

(j) MetLife failed to exercise reasonable flexibility in its claims review process to assure Mr. Errthum a full, fair review, well-reasoned, and principled of his claim;

(k) MetLife administered Mr. Errthum's claim for LTD benefits while acting under an inherent and substantial conflict of interest in that MetLife served both as fiduciary of and funding source for the Plan, and placed its own pecuniary interests above Mr. Errthum's interests

in wrongfully terminating his LTD benefits and failing to administer the Plan as an impartial decision maker, free of such conflict of interest, would;

(l) MetLife made erroneous interpretations of some evidence in violation of its obligation to discharge its duties with care, prudence, skill, and diligence;

(m)   MetLife acted in bad faith by denying Mr. Errthum's claim based upon the inability of MetLife's paid reviewers to find Mr. Errthum disabled, and otherwise failed to administer the Plan honestly, fairly and in good faith, and to at all times act in Mr. Errthum's best interests;

(n) MetLife terminated Mr. Errthum's benefits without the support of any new information that altered in some significant way the previous decision to pay LTD benefits to Mr. Errthum between March 3, 2017 and July 10, 2017;

(o) MetLife terminated Mr. Errthum's benefits without the support of any new information that showed improvement in Mr. Errthum's medical condition, when in fact, his treating physicians opined that his condition continued to deteriorate;

(p) MetLife failed to support the termination of benefits with substantial evidence;

(q) MetLife imposed a standard not required by the Plan's provisions, by requiring objective evidence of Mr. Errthum's subjective medical conditions where such evidence cannot be reasonably provided;

(r) MetLife denied Mr. Errthum's claim for a lack of objective medical evidence when Mr. Errthum has provided ample subjective evidence of a disability and MetLife has neither identified any objective evidence that Mr. Errthum could have supplied to support the claim and has not had Mr. Errthum undergo an independent medical examination or a similar in-person probative procedure to test the validity of his complaints;

(s) MetLife failed to consider Mr. Errthum's non-exertional limitations caused by his disability, such as the side effects of his prescribed medication, his ability to regularly attend work, and the effect his disability has on his concentration, persistence, and pace when performing the material duties of his occupation;

(t) MetLife's termination of Mr. Errthum's LTD benefits failed to provide a detailed explanation and the basis of its disagreement with the opinions of Mr. Errthum's treating physicians;

(u) MetLife wrongfully denied Mr. Errthum's LTD benefits in such other ways to be shown through discovery and/or hearing.

70.     As a result of the foregoing, the relief to which Mr. Errthum is entitled includes: (1) monthly LTD income benefits to Mr. Errthum, (2) payment of back benefits from July 11, 2017, to the date of judgment, (3) pre-judgment interest, (4) equitable relief, including declaratory and injunctive relief, to redress MetLife's practices that are violative of the Plan and ERISA, and to enforce the terms of the Plan and ERISA, and (6) an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## CAUSES OF ACTION

### COUNT ONE
### ERISA (Claim for Benefits Owed under Plan)

71.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

72.     At all times relevant to this action, Mr. Errthum was a participant of the Plan underwritten by MetLife and issued to Pattison Sand Company, LLC and was eligible to receive disability benefits under the Plan.

73.     As more fully described above, the termination and refusal to pay Mr. Errthum's benefits under the Plan for the period from at least on or about July 11, 2017 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA. The decision to deny benefits to Mr. Errthum constitutes an abuse

24

of discretion as the decision was not reasonable and was not based on substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for the following:

1.     A judgment ordering the applicable standard of review in this case is *de novo*;

2.     A judgment ordering that by a preponderance of the evidence, the Defendant has breached its fiduciary duty to the Plaintiff by wrongfully denying his LTD benefits owed to him through the Plan;

3.     In the alternative, if the Court determines that the applicable standard of review is the heightened arbitrary and capricious standard, the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate arbitrary and capricious review and enter a judgment that Defendant's decision to wrongfully deny Plaintiff's LTD benefits was unreasonable, arbitrary and capricious, and unsupported by substantial evidence;

4.     Declaratory and injunctive relief, finding that Defendant violated the terms of the Plan and Plaintiff's rights thereunder by terminating Mr. Errthum's LTD benefits; that Mr. Errthum is entitled to a continuation of future LTD benefits from Defendant pursuant to the Plan;

5.      Declaratory and injunctive relief, finding that Defendant breached its fiduciary duties to Plaintiff; enjoining Defendant from further violations of its fiduciary duties; and directing Defendant to take all actions necessary to administer the Plan in accordance with the terms and provisions thereof and Defendant's fiduciary and other obligations arising under ERISA;

6.      A judgment ordering Defendant to pay Mr. Errthum's LTD benefits from July 11, 2017 through the date judgment is entered herein, together with pre-judgment interest on each and every such monthly payment through the date of judgment;

7.      An award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g);

8.      For such other and further relief as the Court deems just, fit and proper.

Respectfully submitted this the 2nd day of March, 2020.


__/s/ Peter H. Burke_____
Peter H. Burke (ASB-1992-K74P)
pburke@burkeharvey.com
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Phone:    205-930-9091
Fax:    205-930-9054
*Attorney for Plaintiff Rodney Errthum*

26

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:**

Metropolitan Life Insurance Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL  36104